Filed 3/10/25  GSE Properties v. Apro CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION THREE

| | |
|---|---|
| GSE PROPERTIES, LLC, et al., | B338491 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 23STCV01145) |
| v. | |
| APRO, LLC, | |
| Defendant and Respondent. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Kristin S. Escalante, Judge, and Rosalyn Chapman, Referee.  Affirmed.

Larson, Steven E. Bledsoe, Jonathan E. Phillips, Catherine S. Owens, and Andrew S. Bledsoe for Plaintiffs and Appellants.

Pillsbury Winthrop Shaw Pittman, Robert L. Wallan, Mariah L. Brandt, and Lisseth Ochoa-Chavarria for Defendant and Respondent.

—————————————

Plaintiffs and appellants GSE Properties, LLC, NWD Properties, LLC, CHO Properties, LLC, Petrolink Properties, LLC, and Southland Property Investments, LLC, collectively doing business as Platinum Energy (Platinum), appeal from a judgment entered on a referee's order granting summary judgment in favor of defendant and respondent Apro, LLC. Platinum and Apro entered into a multi-faceted business and real estate transaction involving Platinum's sale of 97 gas stations to Apro and the lease of the land on which the properties sat. Later, a dispute arose as to which party was responsible for the property taxes on the leased properties. Platinum filed suit. Pursuant to a provision in the parties' agreement, the matter was submitted to a court-appointed referee.

The parties advanced competing interpretations of the property tax provision in their agreement. Platinum now contends the referee erroneously concluded that the parties' Purchase and Sale Agreement (PSA) and commercial real estate leases unambiguously required Platinum, the landlord, to pay a portion of the property taxes without reimbursement from Apro, the tenant, for the entirety of the lease terms. Platinum argues the referee disregarded evidence and misapplied the law. We find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2018, Platinum owned and operated gas stations and convenience stores throughout Southern California. Phillips 66 is the principal fuel supplier for Platinum.

In late 2018, Platinum's President and CEO, David Delrahim, met with Pam McGinnis, Phillips 66's Vice President of Global Marketing, to discuss Phillips 66's interest in purchasing Platinum's gas stations and stores and leasing the

land underneath.  In early 2019, Phillips 66 and Platinum began negotiating the terms of a conditional letter of intent.

The parties understood that Delrahim was seeking to take advantage of Internal Revenue Code section 199A, which allowed qualified landlords to deduct 20 percent of their rental income from their taxes.  The parties further understood that for Platinum to take the deduction with respect to the properties subject to their deal, the leases had to be structured as "double net."  In a double net lease, the tenant agrees to pay two of three operating expenses related to the property in addition to rent: property taxes, insurance premiums, or maintenance costs.  The landlord covers the remaining expense.  In contrast, a "triple net" lease requires the tenant to pay all three expenses.  Platinum understood that it had to be responsible, "at least on paper," for one of these expenses to qualify for the Internal Revenue Code section 199A deduction.  Throughout the negotiations, the only expense at issue for the purpose of creating a double net lease was property taxes.  Apro does not dispute its responsibility for insurance and maintenance under the lease terms.

On March 21, 2019, Platinum and Phillips 66 signed the conditional letter of intent.  Phillips 66's Vice President, Rex Bennett, and Delrahim were signatories.  The letter established that Phillips 66 would acquire "97 Fuel/Convenience Store assets," a 20-year lease on the 81 locations in which Platinum retained a fee interest, and an assignment of Platinum's leasehold interest in 16 remaining locations.[1]  The letter of intent

---

[1]     The leases involved in the transaction concerned specific properties owned by individual Platinum entities.  Although each executed lease names the specific Platinum entity as the

defined the rental rate as "$20 MM rent + $2.56 MM property taxes = $22.56 MM starting double net rent to Platinum, escalating at 1% each year . . . ."  The parties were required to "[e]nter into a purchase agreement, lease agreement(s) and other ancillary documents" as a condition of closing the deal.

After Phillips 66 and Platinum signed the letter of intent, Apro became involved in the transaction.  Apro, doing business as United Pacific, is one of the companies operating under a joint venture Phillips 66 created with another company sometime in 2019.  Phillips 66 has a 49 percent interest in Apro.  Phillips 66's Managing Director of Corporate Development, Matthew Fischer, remained involved in the negotiations with Platinum.

### PSA and Form Lease

In 2019, the parties began to negotiate the terms of the PSA and its ancillary documents, including the form Land and Building Lease (Form Lease).  The PSA covered several transactions: Platinum's sale of the retail and convenience stores to Apro, Platinum's lease of the parcels of land where the stores were located to Apro, and Apro's sublease of some of the subject properties to Bliss Car Wash, LLC, an entity affiliated with Platinum.[2]

In May 2019, Apro's counsel sent Platinum's counsel a draft of the PSA and the Form Lease.  The Form Lease was based on

---

landlord, we refer to "Platinum" as the landlord throughout this opinion for ease of reference.

[2]     Platinum did not own the land beneath all the retail and convenience stores.  To the extent Platinum was leasing that land from a third party landlord, the PSA provided for Platinum's assignment of its leasehold interests in those parcels to Apro.

4

prior lease agreements Apro or its affiliates had used in other transactions. In Article 3 governing rent, the draft Form Lease provided that Apro was required to pay "Base Rent" (Section 3.02) and "Additional Rent" (Section 3.03). The Additional Rent Section 3.03(b) provided, in relevant part: "Tenant shall pay all Real Estate Taxes directly to the collecting authority no less than thirty (30) days prior to the delinquency date thereof." An attached schedule of terms (Schedule 1) defined Additional Rent as "any and all fees, expenses, taxes and charges of every kind and nature arising in connection with or relating to the Demised Property (other than Base Rent), including (i) any and all taxes (including Real Estate Taxes) . . . . " The schedule defined Real Estate Taxes as "(i) all taxes and general and special assessments and other impositions in lieu thereof, or as a supplement thereto and any other tax measured by the value of real property and assessed on a uniform basis against the owners of real property . . . ."[3]

In June 2019, Platinum's counsel sent revised versions of the PSA and lease agreement to Apro. Platinum revised Section 3.03's provision addressing Real Estate Taxes as follows:

> "(c) ~~Tenant~~ <u>Landlord</u> shall pay all Real Estate Taxes <u>in the amount equal to the amount payable for the tax year ending         [current real estate tax year] (the 'Base Taxes'). If Real Estate Taxes for any period during the term of this Lease exceed the Base Taxes, Tenant shall pay</u> directly to the collecting authority the amount of such excess no less than

---

[3]     We use "property taxes" interchangeably with "Real Estate Taxes" throughout this opinion.

5

thirty (30) days prior to the delinquency date thereof."[4]

Platinum also added Section 3.03(a), providing: "Except as expressly provided in this Lease, Tenant is responsible for payment of any and all costs . . . of any nature whatsoever related to the Demised Property, including but not limited to (i) all personal property taxes, and all other taxes, fees and assessments, related to the use and operation of the Demised Property, including all excise taxes," utilities, insurance expenses, and repair and maintenance costs. Platinum did not revise the definition of "Additional Rent" in Schedule 1.

On July 1, 2019, Fischer e-mailed Delrahim and Platinum's Director of Finance and Real Estate Ellen Lehto a "Business Issues List" with topics to discuss during their in-person meeting the next day. Among them was a bullet point regarding the Form Lease: "Real Estate Taxes – The lease will be a 'double-net' lease. Accept that Landlord will pay real estate taxes and Tenant will pay any increase in such taxes." Fischer, Delrahim, and Lehto met on July 2, 2019. A marked up version of the Business Issues List reflected their discussion, including terms to which they agreed. The word "Agree" appears next to the "Real Estate Taxes" bullet point.

On July 15, 2019, Apro's counsel sent another version of the PSA and Form Lease to Platinum. The draft Form Lease incorporated the terms in the "Business Issues List" that Fischer, Delrahim, and Lehto agreed to during their July 2, 2019 meeting. Apro deleted Platinum's proposed Section 3.03(a) and replaced it

---

[4] In the drafts exchanged between the parties, both inserted revisions. Strike-throughs indicate text the revising party deleted. Underlining indicates text the revising party added.

with a new subsection concerning its obligation to pay general or special assessments. Apro also reorganized and revised Section 3.03(c):

> "Landlord shall pay all Real Estate Taxes ~~in the amount equal to the amount payable for the tax year ending _____ [current real estate tax year] (the "Base Taxes"). If Real Estate Taxes for any period during the term of this Lease exceed the Base Taxes, Tenant shall pay~~ directly to the collecting authority ~~the amount of such excess~~ no less than thirty (30) days prior to the delinquency date thereof. ~~Within five~~<u>Landlord shall be solely responsible for all Real Estate Taxes for the current tax year ending _____ [current real estate tax year] (~~5~~the "Base Taxes"). Tenant shall reimburse Landlord to the extent of any increase in the Base Taxes . . . .</u>"

In Schedule 1, Apro revised "Additional Rent" to mean "any and all fees, expenses, taxes and charges of every kind and nature arising in connection with or relating to the Demised Property (other than Base Rent <u>and Base Taxes</u>), including (i) any and all taxes <u>in excess of Base Taxes</u> (including Real Estate <u>Taxes in excess of Base</u> Taxes) . . . ."

On September 4, 2019, Apro President and CEO Joe Juliano sent Delrahim and Lehto an e-mail with the subject line, "Conditional Offer – Platinum Retail Assets." Juliano stated that at Delrahim's request, he was sending the e-mail to "memorialize" the deal price and terms Delrahim and Fischer had recently discussed. One term was: "$19.125M rent for the fee sites + estimated $2.56M in property taxes . . . on a double net basis, escalating 1% per year beginning in year 3." Juliano stated that apart from the modified terms in the list, the parties "would

7

honor the previously negotiated terms" of the letter of intent. He closed by requesting that Platinum confirm acceptance of the terms by e-mail in two days. On September 6, 2019, Lehto "proposed a few changes and additions" to Juliano's e-mail. To the proposed rent and property tax term she added: "Tenant responsible for all property taxes in excess of the foregoing base amount." She asked Apro to confirm acceptance via e-mail if it agreed to the terms. The record does not indicate whether Apro replied.

On September 9, 2019, Fischer sent Lehto an e-mail stating the parties should "stick close" to their previous agreement and attached the notes from their July 2, 2019 meeting. Later that month, Platinum's counsel sent another draft of the Form Lease to Apro with revisions made "against [Apro's] 7/15 draft." In the accompanying e-mail, he noted that Platinum "added one provision to ensure there is no ambiguity that the lease is a double net lease." The provision Platinum added appears to be its version of Section 3.03(a) from June 2019, which established Apro's responsibility for various other taxes, utilities, insurance, and maintenance and repairs. Platinum's draft retained the language in Section 3.03(c) requiring Platinum to pay "Base Taxes" and Apro to reimburse Platinum "to the extent of any increase in the Base Taxes."

In October 2019, Apro sent another draft of the PSA and Form Lease to Platinum. In relevant part, Apro's draft revised Section 3.03(a) to state that the taxes Apro would be responsible for as "Additional Rent" did not include Base Taxes: "Except as expressly provided in this Lease, including, but not limited to, Section 3.03(c) below, Tenant is responsible for payment of any and all costs . . . related to the Demised Property, including but

8

not limited to (i) all personal property taxes, and all other taxes, fees and assessments, related to the use and operation of the Demised Property . . . ." Apro made no revisions to Section 3.03(c) or Schedule 1's definition of Additional Rent.

***Final Version of PSA and Form Lease***

In December 2019, the parties signed the PSA. The PSA included a final gross purchase price of $221 million. In a provision identifying each party's deliverables at closing, the PSA states that "[f]or each Owned Property," both parties were required to execute the Form Lease, attached as an exhibit.

The final Form Lease described Apro's rent obligations in Article 3. Apro was required to pay Base Rent and Additional Rent. Base Rent is the monthly rent for each property in June 2020 and is specific to each location. Base Rent remains fixed for 12 months, after which it escalates by 1 percent on the anniversary of the lease (Base Date). The amount of Base Rent was left blank on the Form Lease. The PSA required that the parties' lease agreements for each property, to be executed at the close of escrow, "provide for the agreed upon annual base rent set forth on Schedule 6.3(c)." Schedule 6.3(c) listed the annual Base Rents for each of the subject properties, totaling $19.125 million.

Section 3.03 memorializes the final Additional Rent term. Section 3.03(a) provides, in relevant part: "Except as expressly provided in this Lease, including, but not limited to, Section 3.03(c) below, Tenant is responsible for payment of any and all costs, and undertaking all actions, of any nature whatsoever related to the Demised Property, including but not limited to (i) all personal property taxes, and all other taxes, fees and assessments, related to the use and operation of the Demised Property, including all excise taxes, (ii) all utility fees, charges,

9

and connection/acquisition of service costs (iii) all insurance expenses, (iv) all repair, maintenance, and alteration expenses, and (v) all expenses related to indemnities given by Tenant herein."

The final version of Section 3.03(c) provides:

"Landlord shall pay all Real Estate Taxes directly to the collecting authority no less than thirty (30) days prior to the delinquency date thereof.  Landlord shall be solely responsible for all Real Estate Taxes for the current tax year ending _____ [current real estate tax year] (the 'Base Taxes').  Tenant shall reimburse Landlord to the extent of any increase in the Base Taxes within thirty (30) days after Tenant has received evidence from any collecting authority that such Real Estate Taxes have been paid.  Nothing in this Lease shall obligate Tenant to pay any estate, inheritance, franchise, income or similar taxes of Landlord nor shall any of same be deemed Real Estate Taxes, unless the same shall be specifically imposed in substitution for, or in lieu of, Real Estate Taxes.  If Landlord fails to pay to the collecting authority any Real Estate Taxes when due hereunder, then Landlord shall, without limiting any other remedies available to Tenant, reimburse Tenant for any and all penalties or interest, or portion thereof, paid or incurred by Tenant as a result of such nonpayment or late payment by Landlord.  If Landlord receives any notices of assessment from any Governmental Authority for the Demised Property, Landlord shall promptly forward a copy of such notices of assessment to Tenant."

Schedule 1 defines "Additional Rent" as "any and all fees, expenses, taxes and charges of every kind and nature arising in

10

connection with or relating to the Demised Property (other than Base Rent and Base Taxes), including (i) any and all taxes in excess of Base Taxes (including Real Estate Taxes in excess of Base Taxes) . . . ."

The agreement states that the PSA, its attached schedules, and the "Ancillary Agreements"—all documents that Platinum and Apro were required to execute and deliver by closing— "constitute the complete and entire agreement between the parties" and supersede "any prior understandings, agreements, representations and discussions among such parties," including the March 2019 letter of intent between Phillips 66 and Platinum.

### Dispute Over Base Rent Schedules

In May 2020, the parties prepared to close escrow and execute the leases for each subject property. The parties negotiated the Base Rent schedules required by the PSA. The schedule lists the annual and monthly Base Rents for each property over the lease term and during the option periods.

Platinum sent Apro rent schedules that included property taxes for 2020 as part of the Base Rent Apro owed for each property. Platinum claimed "the rents were supposed to be grossed up to include the base year secured property taxes" and sought to update the leases to reflect those amounts. This increased the total Base Rent for all properties from $19.125 million, as listed in Schedule 6.3(c) to the PSA, to over $20 million.

Apro told Platinum that it did "not agree with amending any of the leases or any of the lease rent schedules. The form and the schedules as they have been negotiated and agreed to previously are what they expect to use." Platinum insisted the

11

Base Rent as calculated was "a mistake" because it required Platinum "to pay property tax expense out of rent . . . ."

Lehto contacted Juliano.[5] According to Lehto, Juliano initially agreed that the deal did not contemplate Platinum paying property taxes from the "$19 mil rental income stream and that United Pacific was paying the property tax." Hours later during a follow-up conversation, he told her that the letter of intent did not govern the parties' agreement and if Platinum did not close the deal as written, Apro would "reopen the entire deal and you don't want that." Juliano said Apro would come back to the table at a significantly lower price. Lehto informed Delrahim about the issue.

On May 29, 2020, Delrahim reached out to McGinnis about the disagreement. On June 1, 2020, McGinnis replied: "[A]s I understand it, the lease amount agreed for 2020 did include the provision for payment of property tax. It was agreed that rents would escalate from this starting point and taxes would have an annual true up mechanism to ensure the [joint venture] continues to pay full property tax as time goes forward." Delrahim responded that he was grateful that McGinnis's understanding aligned with his own, but stated Apro "has changed our original understanding [at] the very last minute. We are ready to close as soon as we can resolve this."

Fischer testified that during a conversation with Delrahim around the same time, he told Delrahim, " 'it was all clear that it

---

[5] Juliano's purported statements are based on notes Lehto took during a call with Juliano. Apro objected to this evidence on the grounds that it is hearsay and an improper statement of ultimate fact. The referee did not rule on this objection. Apro does not renew its objection on appeal.

was going to be a double net lease and you knew that you had to pay the taxes.'" He told Delrahim he could walk away from the deal if he wanted to. At some point in June 2020, prior to closing, Juliano and Delrahim also discussed the deal terms. Juliano testified that Delrahim said he had an issue with the structure of the lease and that "his understanding was that Apro was responsible for paying all property taxes, but the structure of the form lease did not reflect his understanding . . . ." Juliano told Delrahim the "economic terms" had been " 'extensively negotiated' " and " 'it is what it is.' "

Platinum proceeded with the closing without revisions to the Form Lease or rent schedules. On June 11, 2020, Delrahim and Juliano signed the first tranche of leases. All leases were executed by the end of the month.[6]

### Reimbursement Dispute

In January 2021, Platinum, through its legal counsel, demanded that Apro reimburse $902,113.18 Platinum paid in property taxes to the collecting authority for the 2020–2021 tax year. Platinum claimed the parties had agreed to a triple net lease in which "the ultimate financial responsibility of the payment of the real estate taxes falls upon the Tenant for the remaining terms of the Leases." Apro refused to reimburse Platinum, citing Section 3.03(c) of the Form Lease as requiring only that Apro pay property taxes in excess of the Base Taxes. Apro also disputed Platinum's claim that the parties agreed to a

---

[6] Although site-specific details varied among the leases— such as the name of the Platinum entity acting as landlord, the commencement date of the lease, and the amount of Base Rent— the leases executed by the parties as to each property were otherwise identical to the Form Lease.

triple net lease, noting that Platinum characterized it as double net during negotiations and never contested Section 3.03(c)'s language prior to closing of escrow.

Delrahim again reached out to McGinnis regarding the dispute. McGinnis replied that "[a]s [Delrahim] pointed out, Phillips 66 began the negotiations with Platinum and then turned them over to United Pacific to finish up. As a result, the contracts were ultimately agreed and executed between Platinum and United Pacific." She said she had the contracts closely reviewed and believed Apro was "following the contract terms for double net leases."

Delrahim responded that Apro was deviating from the deal Phillips 66 had negotiated with Platinum by refusing to reimburse Platinum's property tax payments for 2021. After consulting with others, McGinnis e-mailed Delrahim again, pointing out that his attorney "specifically requested that the leases be double net. . . . A double net lease concept contemplates the landlord paying the property taxes. If the intent had been for the tenant to pay the taxes, the lease would have been characterized as a triple net lease." Ultimately, McGinnis told Delrahim she believed "that the relevant agreements are being correctly interpreted by United Pacific and that they, working with you and your attorney, implemented our agreement to create double net leases and rent amounts as you requested."

*Lawsuit*

In January 2023, Platinum filed suit against Apro for breach of contract and declaratory relief. Platinum alleged the parties' agreement required Apro to reimburse Platinum for annual Real Estate Taxes after the 2020 tax year as part of Apro's Additional Rent, and that Apro had breached the

14

agreement by refusing to provide that reimbursement.  Platinum asked the court to refer the matter to a referee pursuant to the terms of the PSA.  In May 2023, the trial court appointed a referee.

In October 2023, Apro filed a cross-complaint seeking declaratory relief.  Apro alleged that the express terms of the agreement required Platinum, as landlord, to pay all "Base Taxes"—Real Estate Taxes for the tax year ending 2020—and made Apro responsible only for taxes in excess of that amount going forward.

In November 2023, Apro filed a motion for summary judgment.  Apro argued the unambiguous language of the contract and the extrinsic evidence showed no triable issue of material fact regarding Platinum's responsibility to pay property taxes equal to the amount owed for the tax year ending 2020 (the Base Taxes) every year of the lease term, without reimbursement from Apro.  Platinum opposed the motion on the grounds that the plain language of the lease "unambiguously require[d]" that Platinum pay property taxes in tax year 2020, and Apro "pay all property taxes beginning in 2021 . . . ."  Platinum further argued that the extrinsic evidence supported its interpretation and Apro's "unsupported declarations" about its "claimed hidden intent to avoid paying the property taxes" was not evidence of its intent at the time of contracting.

Later that month, Platinum filed a cross-motion seeking summary judgment in its favor on its causes of action for breach of contract and declaratory relief, and on Apro's affirmative defenses of unclean hands and illegality.  Platinum argued that the plain language of the agreement and undisputed material facts established as a matter of law that the agreement obligated

15

Apro to reimburse Platinum for all Real Estate Taxes on the subject properties after the 2020 tax year.

In January 2024, the referee issued a decision. She found no material factual disputes existed and therefore interpreted the Form Lease and the PSA to resolve the cross motions. The referee found Section 3.03(c) of the Form Lease unambiguously obligated Platinum, as landlord, to pay Base Taxes every year for the term of the leases without reimbursement from Apro. The referee rejected the argument that the extrinsic evidence made Section 3.03(c) reasonably susceptible to Platinum's interpretation that Apro was required to reimburse Platinum for all property taxes after the 2020 tax year.

The referee concluded Platinum failed to show Apro materially breached the contract and dismissed Platinum's breach of contract and declaratory relief causes of action. She granted Apro's summary judgment motion after finding Apro established that Platinum was responsible for paying the amount of the 2020 tax year property taxes without reimbursement, throughout each lease term. The referee found Apro's affirmative defenses moot.

The parties stipulated to a final judgment finding Platinum "responsible for payment of the Base Taxes, constituting property tax in an amount equal to the tax year ending 2020, for the length of the Leases," under the PSA and leases. The court entered judgment in favor of Apro on April 19, 2024.[7] This appeal timely followed.

---

[7] Before entry of judgment, the referee granted Apro's motion for over $3 million in attorney fees and costs. Platinum does not challenge the fee and costs award on appeal.

16

**DISCUSSION**

## I. The Referee Did Not Err in Granting Apro's Motion for Summary Judgment

"A trial court will grant summary judgment where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law." (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 6 (*Iqbal*).) A defendant moving for summary judgment prevails "by showing plaintiff cannot establish one or more elements of his cause of action or that there is a complete defense to the cause of action. Plaintiff then bears the burden of showing a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subds. (c), (o)(2); *Aguilar v. Atlantic* Richfield Co. (2001) 25 Cal.4th 826, 843, 849–850.)" (*Ibid.*) We independently review a trial court order granting summary judgment. (*Ibid.*)

On appeal, Platinum contends the referee "failed to adhere to the legal frameworks applicable to summary judgment and contract interpretation." We describe the relevant legal principles and address Platinum's specific contentions, finding no error.

### A. Applicable legal principles of contract interpretation

"The interpretation of a contract is a judicial function." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125 (*Walt Disney*).) "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.)

Here, the parties offered competing interpretations of the Form Lease's provisions regarding the payment of property taxes. Each asserted the contract was unambiguous, and that the

17

language of the Form Lease and extrinsic evidence supported their respective interpretations of Section 3.03(c).

Because contractual obligations flow from "the intention of the parties as expressed in the contract," not from the contract's words in isolation, courts must conduct "at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38, 39–40, fn. omitted (*Pacific Gas*).) " 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]' " (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1356 (*Wolf*); see also Civ. Code, § 1647.)

A court's consideration of extrinsic evidence involves three steps. "First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. [Citations.] When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." (*Walt Disney*, *supra*, 162 Cal.App.4th at p. 1126; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Iqbal*, *supra*, 10 Cal.App.5th at p. 8.)

"This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation." (*Walt Disney*, *supra*, 162 Cal.App.4th at pp. 1126–1127; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) "If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by [the trier of fact]." (*Walt Disney*, at p. 1127; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912–913 [if " interpretation of contractual language turns on a question of the credibility of *conflicting* extrinsic evidence," trier of fact must resolve conflict].)

" 'When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract.' [Citations.]" (*Iqbal*, *supra*, 10 Cal.App.5th at p. 8.)

**B.    Platinum has not demonstrated reversible error in the referee's process of ruling on the parties' dispute**

As an initial matter, we reject the arguments made throughout appellants' briefing that the judgment must be reversed because the referee failed to refer to particular pieces of evidence and therefore must not have considered that evidence; or that the referee misapplied the law, illustrated by the use of terms such as "findings of fact," in one instance, or stating that the parties' agreement was "clear and unambiguous."

First, it is a fundamental rule of appellate review that this court reviews a lower court's ruling, not its rationale. (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.) Second, this court presumes the order is correct and that the referee understood and correctly applied the law. An

19

appellant must affirmatively demonstrate error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) Further, a lower court need not reference every piece of evidence it considered in its ruling. (*Jones v. Solgen Construction, LLC* (2024) 99 Cal.App.5th 1178, 1192.) Absent an affirmative demonstration of error, we will not conclude that the court disregarded evidence merely because the court did not make specific reference to that evidence in a written ruling. (*Herrera v. Doctors Medical Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 546.)

Platinum's citation to *Pacific Gas*, *supra*, 69 Cal.2d 33, does not compel a different conclusion. The trial court in *Pacific Gas* examined only the contractual language at issue and "repeatedly ruled that it would not admit extrinsic evidence to interpret the contract and sustained objections to all questions seeking to elicit such evidence." (*Id.* at p. 36, fn. 1.) The referee here made no such rulings or statements. It examined the extrinsic evidence the parties submitted in support of their respective summary judgment motions after ruling on the parties' evidentiary objections. Platinum has not challenged any of those evidentiary rulings on appeal. The referee's order makes clear that it considered the facts reflected in the admitted extrinsic evidence. The referee did not commit the error the trial court did in *Pacific Gas*.

Our review of the record and the referee's order further indicates the referee did not make "findings of fact" in contravention of the law on summary judgment or rules of contract interpretation. Instead, the referee reviewed the parties' asserted undisputed facts, summarized the evidence in a section titled "Undisputed Material Facts and Reasonable Inferences Therefrom," and considered that evidence consistent with the

20

principles outlined above regarding the consideration of extrinsic evidence in the interpretation of a contract.[8] The referee's singular, passing reference to "Findings of Fact" appears to have been nothing more than a typographical error.

Further, the referee's conclusion that the Form Lease was "clear and unambiguous" was reached after assessment of both the plain language of the agreement and the extrinsic evidence proffered by both sides. As noted above, neither Platinum nor Apro identified material factual disputes on summary judgment and both asserted the contract was not ambiguous. The referee considered the evidence, found no material facts were in dispute and the extrinsic evidence was not in conflict, and thus interpreted the contract as a matter of law. The referee's detailed, 36-page order reveals that the referee's process was ultimately consistent with the principles outlined in *Wolf* and *Walt Disney*.

---

[8] At oral argument, Platinum's counsel contended that the parties had, in fact, disputed material facts on summary judgment. However, the parties' separate statements of fact reflect many purported "disputes" over the legal sufficiency or effect of undisputed facts. (*Page v. MiraCosta Community College Dist.* (2009) 180 Cal.App.4th 471, 479, fn. 2 [disputes "premised on arguments or characterizations about the legal sufficiency of facts and documents" ineffective to create triable issues].) Other "disputes" were based on objections to the competency of the evidence—which are not at issue on appeal—or were raised in response to evidence irrelevant to determining the parties' objective manifestations of intent. Neither party disputed the facts material to interpreting the lease provisions at issue.

## C. The referee did not err in rejecting Platinum's interpretation of the Form Lease language

Platinum contends the referee's interpretation of the language of the Form Lease was incorrect. We disagree.

"The 'clear and explicit' meaning of [contract] provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' ([Civ. Code], § 1644), controls judicial interpretation. (*Id.*, § 1638.)" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) "[I]n construing a contract the court's function is not merely to import all of the possible definitions or even the broadest definition, but to glean the meaning of the words *from the context and usage of the words in the contract itself.*" (*Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1069.) However, "[c]ourts must refrain from altering or rewriting a contract, and they must not 'add a term to a contract about which the agreement is silent.' [Citation.]" (*Arriagarazo v. BMW of North America, LLC* (2021) 64 Cal.App.5th 742, 748 (*Arriagarazo*).)

Section 3.03(c) imposes distinct obligations on the landlord and tenant regarding Real Estate Taxes. The landlord must "pay all Real Estate Taxes directly to the collecting authority." It is "solely responsible for all Real Estate Taxes for the current tax year ending" 2020, deemed the "Base Taxes." The tenant must "reimburse Landlord to the extent of any increase in the Base Taxes within thirty (30) days after Tenant has received evidence from any collecting authority that such Real Estate Taxes have been paid."

Section 3.03(c) indicates two conditions on Apro's reimbursement obligation: (1) Platinum's property taxes must

22

exceed the amount assessed for the 2020 tax year, and (2) Apro must reimburse Platinum "to the extent" of that increase. The phrase "to the extent," understood in its ordinary sense, limits Apro's reimbursement obligation to the difference between the 2020 tax year property taxes and future property taxes assessed. No contractual language expands Apro's reimbursement obligation beyond this increase. While Section 3.03(c) states at the outset that the landlord "shall pay all Real Estate Taxes directly to the collecting authority," the provision includes no language stating that at any point the tenant shall pay all Real Estate Taxes, or reimburse the landlord for all Real Estate Taxes. Similarly, the provision does not include language stating that the tenant is at any point responsible for paying the Base Taxes. To the extent the provision could be understood as requiring the landlord to pay the Base Taxes only for the 2020 tax year, it would appear to be silent as to who is responsible for the Base Taxes in future tax years.

Further, we look to other provisions in the contract as an aid to interpretation. (Civ. Code, § 1641 [contract must "be taken together . . . to give effect to every part" and each provision "help[s] to interpret the other"]; *Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1349 [meaning of contractual language "is to be obtained from the entire contract" and not from portions in isolation].) When the parties intended to require Apro to cover the full costs of other expenses, they included language to this effect. For example, Section 3.03(f) specifies that Apro must pay "all" sales and excise tax, and "all other similar taxes," imposed on rental income. Section 3.03(f) further specifies the mechanism for Apro to meet

23

that obligation, by incorporating the payment as part of rent or remitting the payment directly to the taxing authority.

Similarly, other provisions of the Form Lease provide that Apro must pay "any and all utility services" (§ 3.03(e)), "all costs and expenses" incurred by Platinum for fulfilling Tenant's repair obligations (Article 7), "all property taxes, assessments, and similar charges" for equipment, fixtures, or improvements on the properties (§ 20.01), and "any and all costs of maintaining, repairing and restoring" the properties (Schedule 1, "Additional Rent"). The first two terms, which provide that Apro may or must pay to Platinum "all costs" incurred by Platinum for utilities or repairs, further supports that the Form Lease included language to clearly indicate when the parties intended Apro to bear a total cost or expense, even in the context of reimbursement. Section 3.03(c) neither requires Apro to pay "all" property taxes, nor identifies a method of payment for that amount. The only mechanism specified is reimbursement, and it relates only to increases in Base Taxes. Reading the language in Section 3.03(c) to require Apro to pay all property taxes would create an unexplained aberration.

Platinum contends the plain language of Section 3.03(a) and the Schedule 1 definition of Additional Rent require Apro to assume responsibility for all property taxes after 2020 as a form of Additional Rent. Not so. Section 3.03(a) lists the payments Apro is responsible for as Additional Rent. It requires Apro to pay a myriad of other fees and expenses, including "personal property taxes," "all other taxes, fees and assessments, related to the use and operation" of the properties, and "excise taxes." But it specifically excludes Section 3.03(c) from its scope. Schedule 1 of the Form Lease similarly defines "Additional Rent" to broadly

24

include "fees, expenses, taxes and charges of every kind and nature arising in connection with or relating to" the properties, "*other than Base Rent and Base Taxes*[ ], including (i) any and all taxes *in excess of Base Taxes* (including Real Estate Taxes *in excess of Base Taxes*) . . . ."  (Italics added.)

Neither provision states that Apro is responsible for all Real Estate Taxes after the 2020 tax year or that Apro is responsible for paying or reimbursing the Base Taxes after the 2020 tax year.  We cannot read this language into the Form Lease.  (*Arriagarazo*, *supra*, 64 Cal.App.5th at p. 748; *Jensen v. Traders & General Ins. Co.* (1959) 52 Cal.2d 786, 790 [courts interpreting contracts cannot "insert what has been omitted or omit what has been inserted"].)

We also disagree with Platinum's argument that if Section 3.03(c) is understood to require Apro to reimburse only property tax increases after the 2020 tax year, "there would be no need to define 'Additional Rent' to encompass 'all taxes . . . other than . . . Base Taxes.' "  Platinum's argument ignores that Additional Rent encompasses various types of tax obligations, not just property taxes.  The definition of Additional Rent expressly carves out Base Taxes from this broader tax obligation.

The referee did not err in concluding the plain language of the Form Lease requires Platinum to pay the amount of the 2020 property taxes on the leased properties for the entire lease terms. We turn to Platinum's arguments regarding the extrinsic evidence.

### D. The extrinsic evidence did not compel a ruling in Platinum's favor

As we understand Platinum's arguments on appeal, it asserts the referee ignored certain portions of the extrinsic

25

evidence and, had that evidence been considered, it would have compelled a different result. As indicated above, we reject Platinum's contention that the referee failed to consider the evidence before it. Further, we disagree that the evidence Platinum highlights rendered the Form Lease reasonably susceptible to its interpretation of the property tax provisions. Moreover, even if the evidence made Platinum's interpretation plausible, we would find no error in the referee's conclusion, independently construing the contract, that the Form Lease did not require Apro to pay all property taxes after the 2020 tax year.

### 1. Apro's July 15, 2019 revision to Section 3.03(c)

Platinum contends that Apro's further revisions to the Section 3.03(c) "Additional Rent" provision in the Form Lease on July 15, 2019, disclosed Apro's intent to bear responsibility for all property taxes after tax year 2020. Specifically, Platinum points to Apro's decision to change Platinum's language requiring the landlord to pay "all Real Estate Taxes in the amount equal to the amount payable for" 2020, to instead read that the landlord was "solely responsible for all Real Estate Taxes for the current tax year ending" 2020.

We disagree that Apro's revision indicated its objective intent to change the parties' previously agreed-upon arrangement and assume responsibility for all property taxes from tax year 2021 to the end of the lease terms. In the same set of revisions Platinum relies upon, Apro also revised the definition of the term "Additional Rent" in Schedule 1. The revised language made the tenant responsible for all taxes *other* than Base Taxes, and "any and all taxes *in excess of Base Taxes* (*including Real Estate Taxes in excess of Base Taxes*)," without including any time or date

26

qualifications. This revision undermines Platinum's contention that Apro's revision to Section 3.03(c) was intended to reflect a different agreement that Apro would be responsible for Base Taxes after the 2020 tax year.

Indeed, the evidence supports the conclusion that Apro's July 15, 2019 revisions to the PSA and Form Lease were intended to incorporate all the terms the parties had expressly agreed to on July 2, 2019, including that Platinum would pay Real Estate Taxes and Apro would "pay any increase in such taxes." For example, in addition to the Real Estate Taxes term, the July 2, 2019 written terms indicate Platinum agreed to Apro's proposed terms for the PSA regarding assets, "kick-out" rights, an indemnification cap, the division of fees for filings required by antitrust law, the hiring of existing employees, and reinstatement of the guaranty. The July 15, 2019 PSA draft incorporates all these agreed-upon revisions consistent with the July 2, 2019 written terms. Similarly, the July 15, 2019 draft of the Form Lease incorporated two other terms Platinum expressly agreed to on July 2, 2019, regarding offset rights for indemnification claims and environmental liability.

No evidence in the record indicates that Platinum and Apro agreed to any other property tax arrangement after July 2, 2019, such that Apro's July 15, 2019 revisions could reasonably be understood as an intent to expand its responsibility for property taxes or to limit Platinum's tax obligation to a single tax year. The extrinsic evidence provided no basis to conclude that Apro's revision to the July 15, 2019 draft's Additional Rent provision reflected its intent to pay all property taxes after 2020.

### 2. McGinnis's representations to Delrahim

In its motion for summary judgment, Platinum argued that

McGinnis's statements to Delrahim about her understanding of Apro's property tax obligations supported the conclusion that Platinum's interpretation of the Form Lease was correct as a matter of law. Platinum specifically relied on McGinnis's conversation with Delrahim in 2020, just before the close of escrow, in which she stated that, as she "believed" and "understood it," the Form Lease had been negotiated so that " 'taxes would have an annual true up mechanism to ensure [Apro] continues to pay full property tax as time goes forward.' " In opposition to Apro's summary judgment motion, Platinum cited McGinnis's 2020 statements as evidence that, after Fischer's September 2019 e-mail, Apro "reverted once again and agreed to pay the property taxes . . . ." Platinum further argued that McGinnis's representations were material to the interpretation of the contract because she was involved in the contract negotiations and had a close relationship with Delrahim. According to Platinum, McGinnis's statements precluded Apro's interpretation of the property tax obligations in the Form Lease.

The referee considered and rejected these arguments. Based on the undisputed evidence, the referee inferred McGinnis was not involved in the negotiations over the Form Lease, and Delrahim was aware that McGinnis had no authority to change the negotiated terms at the time he spoke to her before the close of escrow. The referee concluded that McGinnis's statements did not conflict with other, undisputed evidence regarding Delrahim's objective understanding that the Form Lease was "double net"— obligating Platinum "to pay all real estate taxes without reimbursement from Apro except for reimbursement of any increase in the Base Taxes"—and that the Form Lease

28

"contain[ed] no provision for increasing Apro's rents to cover the real estate taxes paid by [Platinum]."

On appeal, Platinum contends the referee erred by making the "factual finding" that McGinnis was not involved in the contract negotiations, and by "ignoring" McGinnis's representation to Delrahim before close of escrow that Apro would "pay full property tax as time goes forward." Platinum also argues McGinnis's statements are material because the evidence reflects that she "played a key role in the parties' understanding of whether the Leases required Appellants or Respondent to pay the property taxes."

Again, Platinum mischaracterizes the referee's order. The referee did not make factual findings regarding McGinnis's involvement, but drew reasonable inferences from the undisputed evidence that McGinnis did not participate in the negotiations after Apro became involved in the deal. Further, to the extent Platinum contends that the evidence of McGinnis's statements compelled a finding that its interpretation of Section 3.03(c) is correct, we disagree.

"The terms of a contract are determined by objective rather than by subjective criteria. The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 (*Winograd*).) Evidence surrounding contract formation may be relevant to the parties' objective manifestations of intent when determining the meaning of contractual language. (See *Barham v. Barham* (1949) 33 Cal.2d 416, 423 (*Barham*) ["subsequent acts or declarations of the parties" may " 'shed[ ] light upon the question of their mutual intention at the time of contracting' "];

29

*Woodbine v. Van Horn* (1946) 29 Cal.2d 95, 104 ["conversations between and declarations of the parties during the negotiations at and before the execution of the contract" may be considered].)

However, " '[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation.' [Citations.]" (*Iqbal, supra,* 10 Cal.App.5th at pp. 8, 12 [declaration by counsel attesting to intent, without evidence counsel expressed intention to others, irrelevant to contract interpretation]; *Wolf, supra,* 114 Cal.App.4th at p. 1357, fn. 18 [disregarding "evidence of the uncommunicated *subjective* intent" of party's representatives when addressing claims of ambiguity].) " 'A party is bound, even if he misunderstood the terms of a contract and actually had a different, undisclosed intention.' [Citation.]" (*Oakland-Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.* (1988) 197 Cal.App.3d 1049, 1058.)

McGinnis's individual, subjective understanding of the parties' property tax arrangement is not an objective manifestation of the parties' intent. McGinnis's undisputed testimony establishes she did not negotiate any deal terms and had not read the PSA or Form Lease in 2019 or 2020. She was involved in only three conversations with Delrahim before the close of escrow: Delrahim's initial proposal to sell in 2018; a discussion with Delrahim on an unspecified date about structuring an agreement "that would help him with his tax situation"; and her e-mail exchanges with Delrahim in June 2020. Yet, the parties expressly agreed that the executed Form Lease superseded any prior agreements, including the letter of intent. And there is no evidence that McGinnis's subjective understanding of the deal as she conveyed it to Delrahim in June 2020 was one she shared with anyone else at Apro.

30

In addition, none of McGinnis's statements referred to the specific terms or language included in any version of the Form Lease. Rather, McGinnis described the rents escalating and having an "annual true up mechanism" to cover full property taxes, when no such mechanism appeared in the Form Lease text. The referee properly rejected Platinum's reliance on McGinnis's e-mail to add or vary terms as written in the Form Lease. (*Iglesia Evangelica Latina, Inc. v. Southern Pacific Latin American Dist. Of the Assemblies of God* (2009) 173 Cal.App.4th 420, 433; *Barham*, *supra*, 33 Cal.2d at p. 423 [extrinsic evidence is used "not to show that 'the parties meant something other *than* what they said' but to show 'what they meant *by* what they said' "].)

Moreover, other undisputed evidence reflects that before closing, Delrahim himself did not interpret the Form Lease to reflect any intention to have Apro reimburse Platinum for all property taxes at any point in the lease term. In both Fischer's and Juliano's conversations with Delrahim before close of escrow, Delrahim raised concerns that the Form Lease did *not* reflect his understanding that Apro would pay all property taxes. Critically, in response to McGinnis's June 2020 e-mail, Delrahim stated that he believed Apro had "changed our original understanding at the very last minute," and that Platinum was prepared to close as soon as the issue was resolved. Thus, even after McGinnis confirmed that she and Delrahim were on the same page before close of escrow, Delrahim did not consider McGinnis's representations to have resolved the issue, or to reflect what the language of the Form Lease stated. The undisputed evidence of McGinnis's statements to Delrahim does not demonstrate or suggest that the executed written agreement reflected the

31

corporate parties' mutual intention that Apro would be responsible for all property taxes at any time during the terms of the leases.

### 3. Delrahim's declaration

Platinum contends the referee made an improper "credibility determination" by rejecting Delrahim's statements made in a declaration in support of Platinum's summary judgment motion. Platinum additionally asserts the referee erred in concluding that Delrahim " 'understood that the Lease contains no provision for increasing Apro's rents to cover the real estate taxes paid by Plaintiffs,' " and in finding that he did not rely on McGinnis's representations when agreeing to close on escrow. Not so.

As described above, the express language of the Form Lease did not set forth a mechanism for including property taxes Platinum paid in "Base Rent." The extrinsic evidence shows that Apro made clear, prior to the close of escrow, its view that the parties' agreement did not contemplate grossing up the Base Rent schedules to include property taxes Platinum had paid; Apro did not agree to change the base rent schedules; and Delrahim nonetheless proceeded with the closing and signed the leases on behalf of Platinum. Platinum did not introduce conflicting extrinsic evidence on this point. While Delrahim attested that he "agreed to close escrow" *after* receiving McGinnis's e-mail, he did not state that he proceeded with the transaction *because of* McGinnis's e-mail. In any event, Delrahim's undisclosed, subjective reliance on McGinnis's interpretation of the Form Lease at the time he decided to close escrow is not relevant to interpreting Section 3.03(c) objectively.

32

(*Iqbal*, *supra*, 10 Cal.App.5th at pp. 8, 12.) The referee did not make any improper credibility determinations.

### 4. Subleases

Platinum contends the referee erred by "excluding" from consideration the Form Sublease between Apro and Bliss Car Washes, LLC, an entity affiliated with Platinum. Again, we disagree.

The subleases allowed Platinum to operate car washes in some of the gas stations Platinum leased to Apro. The subleases are "subject and subordinate to" the Form Lease and incorporate the terms of that lease "except to the extent they are expressly deleted or modified" by the Sublease. The subleases provide that Apro and the subtenant split the property tax and common area management expenses, with Apro responsible for 65 percent and the subtenant responsible for 35 percent. Juliano testified "[t]o the extent that according to . . . the primary lease, [Apro was] responsible for paying property taxes, then this allocation would apply."

The referee found the Sublease's provision regarding taxes was not relevant to the rent provision in the Form Lease between Platinum and Apro. Because Platinum failed to proffer evidence regarding "the context or circumstances under which the Form Sublease was made," the referee concluded the Sublease was "*sui generis* and is not a contract that must be considered to interpret the meaning of the PSA and Form Lease."

Platinum contends that it provided sufficient evidence about the circumstances surrounding the parties' entry into the Form Sublease. It points to evidence showing the Subleases were contemporaneously executed with the Leases, "concerned the same properties," and "addressed the same subject matter as the

33

Leases—property taxes." However, Platinum proffered no extrinsic evidence connecting the negotiations over the Form Lease property tax provisions to the separate subleases. Moreover, Platinum fails to address the plain language of the Form Sublease that establishes that Article 3 (Rent) in the Form Lease—which contains the contested Base Taxes language at the heart of this appeal—"shall not apply to this Sublease." We therefore reject Platinum's contention that the terms of the Form Sublease made the Form Lease reasonably susceptible to Platinum's interpretation of the parties' property tax obligations.

### 5. Fischer's September 2019 e-mail

Finally, Platinum contends the referee made "factual findings" by crediting Apro's evidence—namely, Fischer's September 2019 e-mail, and the July 2, 2019 terms it incorporated—to conclude that those terms were the basis of the parties' further negotiations and their final agreement. Specifically, Platinum points to the fact that the extrinsic evidence shows that neither Apro President and CEO Juliano nor Apro CFO Marvin Toland "communicated to anyone" or "heard anyone" confirm that Platinum would pay property taxes after Juliano sent the September 4, 2019 conditional offer proposing Apro would pay property taxes.

The referee's conclusion was not a factual finding. Rather, she properly drew the reasonable inference that the parties had agreed to the July 2, 2019 terms in September 2019, and that agreement remained in place when the parties signed the PSA in December 2019.

Contrary to Platinum's contention, Juliano's and Toland's testimony does not create a conflict in the extrinsic evidence precluding the referee's resolution of the issue on summary

34

judgment. Juliano testified only that he did not recall directly e-mailing Delrahim and did not have any conversations with Delrahim establishing that Platinum was paying property taxes. And while Toland did not recall Apro or Phillips 66 representing that Platinum would bear the property tax burden during negotiations, or hear Delrahim or his attorney confirm Platinum would pay property taxes without reimbursement, Platinum did not dispute Toland's testimony that he had "virtually" no role in negotiating the lease agreement and did not discuss property tax responsibilities with Platinum. That Juliano did not have specific conversations with Delrahim about Platinum's tax obligations, and that Toland in his limited negotiating capacity did not hear explicit representations about tax obligations, are not "outward manifestations of consent [that] would lead a reasonable person to believe" Apro was agreeing to reimburse Platinum for all property taxes. (*Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942–943 ["the primary focus in determining the existence of mutual consent is upon the acts of the parties involved"].) For similar reasons, that Fischer did not tell Lehto her understanding of the property tax agreement was incorrect during a conversation they had in May 2020 over the Base Rent schedules also does not reveal that Apro agreed to assume responsibility for the property taxes. (*Id*. at p. 943.)

Platinum also points to Juliano's statement to Lehto in May 2020 agreeing "that the deal never contemplated [Platinum] paying property taxes" as support for its contention that Fischer's September 2019 e-mail did not represent the parties' final intentions regarding property taxes. But Lehto testified that during a call only hours later, Juliano stated the conditional letter of intent did not " 'dictate[ ] constructs' " and was " 'just a

nebulous document,' " insisted that Apro wanted to close on the deal with the Base Rent schedules as written by the following Monday, and warned that the parties' failure to do so would result in Apro coming back to the table at a significantly lower price. Lehto testified she was "very upset" and "taken aback" with Juliano's position, and recognized the disagreement required her to escalate the issue to Delrahim. It is therefore not reasonable to conclude that Juliano's initial statement—made months after execution of the PSA, and swiftly rescinded, such that Platinum understood Apro's position to be adverse to their interests—constituted an objective expression of Apro's intent to pay property taxes. Nor can it reasonably be inferred that Juliano's statement displaced Fischer's September 2019 e-mail, the parties' July 2019 agreed-upon terms, and the consistent recognition by both sides during the negotiations that the lease was to be a double net lease. (*Winograd*, *supra*, 68 Cal.App.4th at p. 632.)

Platinum has identified no conflict in the extrinsic evidence that the referee failed to recognize—only, at most, conflicting inferences. Independently reviewing the contract and the extrinsic evidence, we, like the referee, determine that the parties' agreement does not require Apro to reimburse Platinum for all property taxes on the leased properties after the 2020 tax year.

**DISPOSITION**

The order and judgment are affirmed.  Respondent to recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:


EDMON, P. J.


EGERTON, J.